IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICE SYSTEMS LTD. and NICE
SYSTEMS, INC.

      Plaintiffs,

v.

CLICKFOX, INC.,

      Defendant.

Civil Action No. 15-743-RGA

MEMORANDUM OPINION

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Guy Yonay, Esq., Clyde A. Shuman, Esq., PEARL COHEN ZEDEK LATZER BARATZ LLP, New York, NY.

Attorneys for Plaintiffs Nice Systems Ltd. and Nice Systems, Inc.

Mary W. Bourke, Esq., Daniel M. Attaway, Esq., WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Wilmington, DE; Douglas D. Salyers, Esq., James E. Schutz, Esq., Puja Patel Lea, Esq., Dustin B. Weeks, Esq., TROUTMAN SANDERS LLP, Atlanta, GA; Anup M. Shah, Esq. TROUTMAN SANDERS LLP, Charlotte, NC.

Attorneys for Defendant Clickfox, Inc.

September 15, 2016

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Defendant's two motions to dismiss for failure to state a claim. (D.I. 17, 20). The issues have been fully briefed. (D.I. 18, 21, 23, 25, 27, 28). The Court held oral argument on April 22, 2016. (D.I. 30). For the reasons that follow, the Court will grant Defendant's motion as to patentable subject matter and dismiss as moot Defendant's motion for failure to state a claim of induced infringement.

## I. BACKGROUND

Plaintiffs filed this patent infringement lawsuit against Defendant on August 27, 2015. (D.I. 1). Plaintiffs originally asserted that Defendant infringed "at least claim 12" of U.S. Patent. No. 8,976,955 ("the '955 patent"). (*Id.* at 5, ¶ 23). Thereafter, Defendant filed a motion to dismiss alleging that claim 12 of the '955 patent was directed to patent-ineligible subject matter and that the complaint failed to state a claim of induced infringement. (D.I. 9, 10). Plaintiffs then filed an Amended Complaint on November 16, 2015. (D.I. 14). Defendant subsequently filed the two instant motions to dismiss the Amended Complaint. (D.I. 17, 20).

The '955 patent is directed to a system and method of tracking user web interactions and using that information to generate real-time recommendations when a contact center agent is later contacted by that user. (*See, e.g.*, '955 patent abstract; *id.* claim 1). The summary of the invention section of the specification describes the invention as follows:

> A device, system, and method is provided for monitoring a user's interactions with Internet-based programs or documents. Content may be extracted from Internet server traffic according to predefined rules. Extracted content may be associated with a user's Internet interaction. The user's Internet interaction may be stored and indexed. The user's Internet interaction may be analyzed to generate a recommendation provided to a contact center agent while the contact center agent is communicating with said user, e.g., in real-time, for guiding the user's Internet interaction. Traffic other than Internet server traffic may also be used.

('955 patent, col. 1, ll. 45–57).

2

## II. LEGAL STANDARD

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," as "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (internal quotation marks and emphasis omitted). In order "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294 (emphasis omitted).

The Supreme Court recently reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* If the answer is yes, the court must look to "the elements of the claim both individually and as an 'ordered combination'" to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to

3

significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (alterations in original) (quoting *Mayo*, 132 S. Ct. at 1297). "[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300. Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* For this second step, the machine-or-transformation test can be a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015). The Federal Circuit follows regional circuit law for motions to dismiss. *Content Extraction*, 776 F.3d at 1346. When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a

4

representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks omitted).

## III. DISCUSSION

The '955 patent contains three independent claims: claim 1, claim 12, and claim 29. At oral argument, Plaintiffs agreed that claim 1 or claim 12 would be representative. (D.I. 30 at 28–29). Claims 1 and 12 are nearly identical, aside from claim 1 being directed toward a "method" and claim 12 being directed toward a "system":

| Claim 1 | Claim 12 |
| --- | --- |
| 1. A method for monitoring a user's interactions with Internet-based programs or documents, the method comprising:<br><br>extracting content from Internet server traffic according to predefined rules;<br><br>associating the extracted content with one or more of a user's Internet interaction sessions;<br><br>storing and indexing the user's Internet interaction sessions;<br><br>automatically comparing, by a web analyzer using a processor, one or more of the user's Internet interaction sessions to one or more modeled sessions to generate a recommendation of one or more future session paths from the modeled sessions for guiding the user's Internet interactions; and<br><br>providing the recommendation of the future session paths from the modeled sessions on screen to a contact center agent while the contact center agent is communicating with said user during a telephone call initiated by the user between the agent and the user. | 12. A system for monitoring a user's interactions with Internet-based programs or documents, the system comprising:<br><br>a processor to extract content from Internet server traffic according to predefined rules, associate the extracted content with one or more of a user's Internet interaction sessions, index the user's Internet interaction sessions, automatically compare one or more of the user's Internet interaction sessions to one or more modeled sessions by executing a web analyzer to generate a recommendation of one or more future session paths from the modeled sessions for guiding the user's Internet interactions and to provide the recommendation of the future session paths from the modeled sessions on screen to a contact center agent while the contact center agent is communicating with said user during a telephone call initiated by the user between the agent and the user; and<br><br>a storage device to store the one or more of the user's Internet interaction sessions. |

5

Claim 29 is nearly identical to claim 1, aside from not requiring that the user's Internet interaction sessions be compared to one or more "modeled sessions." (*Id.* claim 29). Instead, claim 29 more generally requires that the web analyzer analyzes the Internet interaction sessions to generate a recommendation. (*Id.*).

### A. *Mayo/Alice* Step One: Abstract Idea

"First, we determine whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. "The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (internal quotation marks omitted) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). "The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The Supreme Court has recognized, however, that "fundamental economic practice[s]," *Bilski*, 561 U.S. at 611, "method[s] of organizing human activity," *Alice*, 134 S. Ct. at 2356, and mathematical algorithms, *Benson*, 409 U.S. at 64, are abstract ideas. In navigating the parameters of such categories, courts have generally sought to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. "But in determining whether the claims are directed to an abstract idea, we must be careful to avoid oversimplifying the claims because '[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (alterations in original) (quoting *Alice*, 134 S. Ct. at 2354).

Defendant argues that the '955 patent seeks "to cover the basic and well known business concept of providing a customer recommendation by gathering customer data from one

6

communication channel and providing a customer recommendation via another communication channel." (D.I. 18 at 13). Defendant contends that, like the concept of "intermediated settlement" in *Alice*, the '955 patent seeks to claim "'a building block of the modern economy.'" (*Id.* (quoting *Alice*, 134 S. Ct. at 2356)). Plaintiffs respond by repeatedly arguing that the '955 patent is directed to a computer-rooted, Internet-specific problem. (D.I. 23 at 16–18).

"Under step one of *Mayo/Alice*, the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents*, 790 F.3d at 1346. Here, the claims are directed to the abstract idea of cross-channel customer service,[1] i.e., gathering customer information from one communication channel and using it to engage the customer via another communication channel. Indeed, cross-channel customer service is certainly "a fundamental economic practice long prevalent in our system of commerce," which more recently, with the proliferation of new communication channels such as social media, has become firmly established as "a building block of the modern economy." *Alice*, 134 S. Ct. at 2356. While claim 1 requires concrete, tangible components—such as "Internet-based programs or documents," "a web analyzer using a processor," and "modeled sessions"—much like in *TLI Commc'ns*, "the specification makes clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea." *TLI Commc'ns*, 823 F.3d at 611. The specification repeatedly describes the problem presented and solved by the invention of the '955 patent as maintaining a consistent customer experience across different communications channels. ('955 patent, col. 1, ll. 36–41 ("Further variability may be introduced when customers use multiple different channels of communication, such as the Internet and call center for customer service. . . . [A]gents contacted via one channel may have

---

[1] "Customer service," as the '955 patent itself confirms, can include "provid[ing] technical support, sell[ing] products or schedul[ing] appointments." ('955 patent, col. 1, ll. 16–19).

7

no way to track a customer's history across another channel."); *id.* col. 4, ll. 43–45 ("Customer interactions may be tracked using 'cross-channel' analysis, e.g., across multiple channels of communication."); *id.* at 5:66–6:2 ("The real-time guidance message may offer up-sell or cross-sell options, for example, according to the analysis of the web interaction and business rules in a recommendations database.")). Courts have routinely found that similar claims are directed to abstract ideas. *See, e.g., Elec. Power Grp., LLC v. Alstom S.A.*, -- F.3d --, 2016 WL 4073318, at *3 (Fed. Cir. Aug. 1, 2016) (claims directed to "collecting information, analyzing it, and displaying certain results of the collection and analysis" were abstract); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (customizing web page content based on information known about the user, i.e., information tailoring, was an abstract idea); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (claims directed to "automat[ing] or otherwise mak[ing] more efficient traditional price-optimization methods" were abstract); *Content Extraction*, 776 F.3d at 1347 (claims directed to collecting, recognizing, and storing data were found abstract); *Pragmatus Telecom, LLC v. Genesys Telecommc'ns Labs., Inc.*, 114 F. Supp. 3d 192, 200 (D. Del. 2015) (claims were "directed to the abstract idea of communication between a customer and a business using a call center, automated and obfuscated along the way using certain computer, telephonic and network services").

Relying on *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014), Plaintiffs contend that "the '955 patent provides a concrete, specific solution to a problem necessarily rooted in computer and internet technology," namely, "how to provide call center agents (who only have access to customer service systems) with useful information about users' Internet session information (which is not available in customer service systems)." (D.I. 23 at 16). Plaintiffs argue that the claims of the '955 patent "like those in *DDR*, recite a specific computer

8

manipulation to solve a problem specifically arising the in the realm of computers and the Internet." (*Id.* at 18). Plaintiffs misread *DDR Holdings*. There, the Federal Circuit stated that "identifying the precise nature of the abstract idea [was] not as straightforward as in *Alice*" or other cases. *Id.* Therefore, the court simply assumed that the patent-in-suit was directed to an abstract idea, and then proceeded to *Mayo/Alice* step two. *See id.* ("[U]nder any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two.").

Stripped of its generic computer components and limitation to a particular technological environment, an analogy demonstrates how the claimed method is abstract. A customer walks into a car dealership and encounters a car salesman. The customer tells the car salesman what she is looking for, the salesman shows the customer various cars on the lot, and the customer expresses enthusiasm for specific cars or features throughout the encounter, which the salesman notes along with his other observations of the customer. The customer decides not to buy anything that day. Later that day, the salesman thinks back to past customers who shared similar personal characteristics, interests, and concerns with this particular customer and remembers that they all purchased the same make and model of car, the 2014 WonderCar SLE. The salesman creates a file for the particular customer and makes a note of this recommendation in the customer's file. Several days later, the customer calls the dealership to ask a few questions and reaches salesman B. During the conversation, Salesman B pulls the dealership's file for the customer and sees the note suggesting that a 2014 WonderCar SLE would be perfect for this customer. Salesman B proceeds to recommend that the customer swing by the dealership to look at a red 2014 WonderCar SLE. Aside from the use of automation via generic computer components to increase efficiency, the salesman has just practiced the claimed method.

9

Lastly, in *Enfish*, the Federal Circuit recently clarified that a relevant inquiry at *Alice* step one is "to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea . . . ." *Enfish*, 822 F.3d at 1335. It explained that courts should seek to distinguish between claims that are "directed to an improvement in the functioning of a computer" versus "simply adding conventional computer components to well-known business practices." *Id.* at 1338. The Federal Circuit found that the claims at issue in *Enfish* were not directed to an abstract idea because the claims outlined a "specific asserted improvement in computer capabilities . . ., [rather than] a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1336. The claims here do precisely the opposite of the claims in *Enfish*.

Plaintiffs' efforts to summarize the invention of the '955 patent highlight the fact that the '955 patent does not claim any "improvement in computer capabilities," but instead claims an "abstract idea for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1336. More specifically, Plaintiffs essentially parrot the claim language, arguing that:

> [T]he invention of the '955 patent involves a system and multi-step computerized method, according to which [1] content is extracted from Internet server traffic according to predefined rules, [2] the extracted content is associated with one or more of a user's Internet interaction sessions, [3] the user's Internet interaction sessions are indexed, [4] one or more of the user's Internet interaction sessions are compared to one or more modeled sessions to generate a recommendation of one or more future sessions paths, and [5] the recommendation is provided on a screen to a contact center agent in real time, while the contact center agent is communicating with the user during a user-initiated telephone call. As described below, each one of the above stages or sub-systems is computerized, and cannot be performed by a person.

(D.I. 23 at 8). Plaintiffs' brief then goes on for four pages outlining the steps of the claims and filling in details from the specification. (*Id.* at 8–11). However, Plaintiffs do not once point to anything in the specification that could conceivably constitute an advance or improvement in

10

technology for performing this method. Instead, the portions of the specification Plaintiffs rely upon merely describe a series of generic computer components that perform the claimed method steps—"a data extractor or other web capture device," "an analysis server," "an interactions database, which may include an index server," "a web analyzer," and "modeled sessions." (*Id.* at 8–11). Accordingly, the specification does not evidence any improvement in computer technology itself, but "merely provide[s] a generic environment in which to carry out the abstract idea." *TLI*, 823 F.3d at 611.

I therefore conclude that the claims are directed to the abstract idea of cross-channel customer service.

### B. *Mayo/Alice* Step Two: Inventive Concept

The determination that a patent is directed to an abstract idea "does not render the subject matter ineligible." *Internet Patents*, 790 F.3d at 1346. Having decided that the patent's claims are directed to an abstract idea, the Court must next "determine whether the claims do significantly more than simply describe the abstract method." *Ultramercial*, 772 F.3d at 715. Since "a known idea, or one that is routine and conventional, is not inventive in patent terms," this analysis "favors inquiries analogous to those undertaken for determination of patentable invention." *Internet Patents*, 790 F.3d at 1346. Indeed, the Federal Circuit has noted that the two stages of the *Alice* two-step inquiry "are plainly related" and "involve overlapping scrutiny of the content of the claims . . . ." *Elec. Power Grp.*, 2016 WL 4073318, *3. Furthermore, neither "[a] simple instruction to apply an abstract idea on a computer," nor "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" satisfies the requirement of an "inventive concept." *Intellectual Ventures*, 792 F.3d at 1367.

Defendant argues, "At *Alice* step two, the asserted claims add nothing inventive—they just direct practitioners to implement the abstract idea using conventional computer components performing generic computer functions." (D.I. 27 at 7). Thus, according to Defendant, the '955 patent is merely "directed to speeding up an age-old customer service process through the use of computers—and not a scientific or technological advancement." (D.I. 18 at 16). Focusing on the fact that the claims are directed to extracting content from a user's Internet sessions, Plaintiffs argue that the '955 patent's claims contain an inventive concept because they are limited to a specific technological solution such that they would not preempt every manner of making cross-channel recommendations to customers. (D.I. 23 at 20). After repeating the language of claim 1, Plaintiffs continue to argue that the claims describe a "complex, computer-tethered process" because, for example, "extracting content from Internet server traffic is a complex task necessarily rooted in computer and Internet technology" and "a web analyzer is an Internet-specific software module." (D.I. 23 at 20–21). Moreover, Plaintiffs argue that the claimed "modeled sessions" provide an inventive concept because they are part of a "computer-specific process that reviews customer history and ideal session history to generate in real time a recommendation." (*Id.* 23). Plaintiffs emphasize, "This is not human-performable, as these are complex mathematical models based on an enormous amount of data." (*Id.*). Lastly, Plaintiffs contend that *DDR Holdings* is controlling because the '955 patent provides a solution tethered to the technology that created the problem.

I conclude that the independent claims of the '955 patent (1, 12, and 29) do not add any inventive concept to the abstract idea of cross-channel customer service. First, Plaintiffs' arguments—focusing on the fact that the claims require automatic, real-time analysis—confirm that the claims are merely directed to using generic computer components to add efficiency and

12

speed to the abstract idea of cross-channel customer service. However, it is well-settled that claims simply directed toward performing the abstract idea using generic computer components, such as a processor, do not contain an inventive concept. *See, e.g., Elec. Power Grp.*, 2016 WL 4073318, at *5 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology . . . . We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept in the application of an abstract idea." (internal quotation marks omitted)); *Intellectual Ventures*, 792 F.3d at 1371 ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility."); *Content Extraction*, 776 F.3d at 1347–48 ("For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" (alteration in original) (quoting *Alice*, 134 S. Ct. at 2359)).

For example, the claims describe a "web analyzer using a processor" that can automatically compare one or more of the user's Internet interaction sessions to one or more "modeled sessions" to generate a recommendation. ('955 patent, claims 1, 12, 29). This claim language simply describes using a generic processor to speed up an analytical process. While the use of computer processors and real-time predictive analytics can certainly make analyzing information faster and more efficient, courts have repeatedly held that merely using a computer to increase the efficiency of a fundamental business practice is insufficient to transform the abstract idea into an inventive application. *See, e.g., Intellectual Ventures*, 792 F.3d at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.");

13

*MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.").

Second, unlike in *DDR Holdings*, the problem the '955 patent purportedly addresses is not itself inherently limited to the specific technological environment claimed by the patentee, as Plaintiffs suggest. The communications channels generally implicated by cross-channel customer service and marketing are not so limited. Indeed, as the amounts of different customer service channels have increased with new technology, cross-channel customer service could implicate a number of different channels through which businesses communicate with customers. For instance, one could replace the Internet interaction sessions and call center claimed by the patent with a company's mobile application and a customer support representative communicating with the consumer via text message.[2] Likewise, the challenges of cross-channel customer service can arise between brick-and-mortar stores and a company's national, centralized call center. Regardless of which two customer service channels are selected, the abstract idea is the same, cross channel customer service, i.e., providing customers with an integrated customer service experience across different communications channels.

Moreover, Plaintiffs' repeated incantations of "rooted in computer technology," "Internet-specific," and the like do not make this case similar to *DDR*, nor can they save claims directed to an abstract idea. In *DDR Holdings*, the claims at issue addressed "the problem of retaining website visitors that, if adhering to the routine, conventional functional of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on

---

[2] I acknowledge that Plaintiffs may argue that the patent's claims are broad enough to encompass these alternative channels. I think this raises a considerable concern that the '955 patent would preempt the field, as I discuss below.

14

an advertisement and activating a hyperlink." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Thus, the Federal Circuit emphasized that, unlike other cases where it invalidated patents under § 101, "these claims [stood] apart because they [did] not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* Unlike *DDR*, the challenges of maintaining a consistent, integrated customer service platform have existed as long as businesses have operated using multiple communications channels. While the proliferation of Internet and mobile technologies has no doubt provided new challenges for companies seeking to provide quality cross channel customer service, this does not render the problem addressed by the '955 patent an "Internet-specific" problem or one "rooted in computer technology." Moreover, it certainly does not give Plaintiffs a license to claim the abstract idea of engaging customers across multiple communications channels by simply limiting one of the claimed channels to being the Internet, especially where the Internet was a well-established medium in the world of commerce well before the patentee filed for the '955 patent in 2011.

Here, the limitation to a specific technological environment is not inherent in the problem faced in cross-channel customer service, but is provided in the claims by the patentee. More specifically, the patentee made the deliberate choice to limit the claimed data gathering to being from "Internet Server Traffic" and to limit the subsequent recommendation to occurring when the consumer initiates contact with the contact center agent. (*See, e.g.*, '955 patent, claim 1). Limiting the claims to these communication channels in this order—(1) gathering information from the Internet, then (2) communicating a recommendation via a contact center agent when the user initiates a call—does not provide an inventive concept to rescue an otherwise abstract idea. Indeed, the law is clear that a patentee cannot manufacture an inventive concept by claiming an

15

abstract idea but limiting it to a specific technological environment. *See, e.g.*, *Alice*, 134 S. Ct. at 2358 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." (quoting *Bilski*, 561 U.S. at 610–11); *Intellectual Ventures*, 792 F.3d at 1366 ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet."); *Elec. Power Grp.*, 2016 WL 4073318, at *4. Here, that is all that the '955 patent does. It takes the abstract idea of cross-channel customer service, and limits it to a specific context that is not all that limiting, where the customer browses the Internet and subsequently calls a business's contact center.

Moreover, despite this purported limitation by the patentee, the broad claim terms employed in the '955 patent raise a genuine concern that the claims of the patent would largely preempt the integrated sales and customer service approaches of most modern businesses. Language such as "Internet server traffic" and "internet interaction sessions" could broadly sweep in any form of Internet-connected activity. Another example of the considerable breadth of the claims is that the specification states that "calling" is not limited to a traditional telephone call, but essentially includes any user-initiated contact with the contact center agent. ('955 patent, col. 3, ll. 54–59 (stating that "calling" can include "using a traditional telephone or other device such as a VOIP telephone, cellular telephone, or other device, to speak with another person" and pointing out that "embodiments of the invention may allow for a user to contact an agent via other methods, such as on-line chat")). Accordingly, the '955 patent would essentially preempt an entire integrated customer service strategy, whenever a user uses any Internet-based platform and subsequently initiates contact with anything that can be described as contact center.

Third, the claims and specification of the '955 patent do not provide any technical explanations as to how any of the various computer components function or provide the desired efficiency, but instead resort to vague, functional descriptions of the components. For instance, the specification describes the "web analyzer" in terms of its basic functions, rather than anything significant about the technology itself, stating that it "may retrieve data from capture storage 414 and/or capture database 416 and may analyze the data, identify, filter, save or extract interesting elements, such as, products and products prices . . . ." ('955 patent, col. 4, ll. 52–56). The Federal Circuit has recently clarified that such functional, result-oriented claims are a hallmark of claims commonly found invalid under § 101. *See Elec. Power Grp.*, 2016 WL 4073318, at *6 ("Indeed, the essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology to carry out economic transactions."); *TLI Commc'ns*, 823 F.3d at 615 ("While these units purport to add additional functionality to the server, the specification limits its discussion of these components to abstract functional descriptions devoid of technical explanation as to how to implement the invention. . . . Such vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention."). Accordingly, I find that the claims of the '955 patent are "so result-focused, so functional, as to effectively cover any solution to [the] identified problem." *Elec. Power Grp.*, 2016 WL 4073318, at *6.

Fourth, the "modeled sessions" do not add any sort of inventive concept to transform the claims so as to be patent-eligible. While the specification does not explicitly define "modeled sessions," it seems to suggest that they are "one or more corresponding ideal session histories or summaries for comparison, for example, to predict optimal future session paths to recommend to

17

the customer." ('955 patent, col. 5, ll. 10–13). At oral argument, Plaintiffs' counsel similarly described "modeled sessions" as "computer constructs that associate certain web interactions with particular outcomes," or model outcomes. (D.I. 30 at 13:3–4). Accepting Plaintiffs' characterization for purposes of this motion, the "modeled sessions" appear to represent no more than making a basic statistical inference, or prediction of future behavior based on available data. The specification provides no guidance as to how modeled sessions are generated or what data inputs they may be based on, instead describing a broad, vague concept. Generically claiming the comparison of data to models, without explaining how those models are created or how those comparisons work, certainly does not add an inventive concept to the claimed abstract idea.

Lastly, Plaintiffs made no specific arguments in their answering brief or at oral argument that any of the dependent claims offer an inventive concept over and above those of the independent claims. Indeed, Plaintiffs' counsel indicated at oral argument that claims 1 and 12 are representative. (D.I. 30 at 28–29). Defendant argues that the asserted dependent claims—claims 3–5, 8–11, 14, 17, 19–20, 25, and 27–28—do not provide a sufficient inventive concept to transform the abstract idea into a patent-eligible application of that idea. (D.I. 18 at 21). Specifically, Defendant argues:

> For example, Claims 3 and 25 add limitations related to gathering content about common webpage actions like the title of a webpage and product details viewed. Claims 4, 5, and 17 add limitations related to generating a summary of the user's past or current Internet sessions, which simply describe the user's sessions, products viewed, and prices offered. Claim 20 adds that the modeled sessions are generated by real-life sessions with users. Claim 27 adds displaying 'a key-value summary' of the content to the agent during the telephone call. Claim 28 adds the concept of letting a user determine the web elements to be extracted on a web page.

(D.I. 18 at 21). After reviewing these dependent claims, I find that Defendant's summary of these claims' minimal additional contributions is accurate. The dependent claims not explicitly addressed by Defendant, likewise add nothing even arguably inventive. ('955 patent, claim 9

18

(adding that "information analyzed in the user's Internet interaction sessions includes key words the user used for searching"); *id.* claim 11 (adding that recommendation "is provided to the contact center agent in real-time"); *id.* claims 22–24 (adding variations in the structure of the "modeled sessions," such as modeled sessions with a "fixed linear path of webpages to browse" or "a dynamic tree-structure of paths"). I thus conclude that none of the asserted dependent claims provides an inventive concept rendering the abstract idea patent-eligible.

I conclude that the asserted claims of the '955 patent are directed to an abstract idea and lack an inventive concept. The asserted claims of the '955 patent are therefore invalid. Plaintiffs have failed to state a claim upon which relief can be granted. In light of this decision, Defendant's Motion to Dismiss for Failure to State a Claim as to Induced Infringement (D.I. 20) will be dismissed as moot.

## IV. CONCLUSION

For the reasons set forth above, the motion to dismiss for lack of patentable subject matter (D.I. 17) will be granted. An appropriate order will be entered.